IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRIAN SIMS, | Case No. 1:19-cv-2784 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

## I. Introduction

Plaintiff, Brian Sims, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. § 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 11; ECF Doc. 12. Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Sims's application for SSI must be AFFIRMED.

## II. Procedural History

On February 28, 2017, Sims applied for SSI. (Tr. 15, 120-25).[1] Sims alleged that he became disabled on August 1, 2016, due to "low vision in right eye." (Tr. 120, 140). The Social Security Administration denied Sims's application initially and upon reconsideration. (Tr. 50-

---

[1] The administrative transcript appears in ECF Doc. 10.

73). Sims requested an administrative hearing. (Tr 87-90). ALJ William Leland heard Sims's case on November 14, 2018 and denied the claim in a December 3, 2018 decision. (Tr. 12-49). On October 4, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). On November 26, 2019, Sims filed a complaint to obtain judicial review. ECF Doc. 1.

### III. Evidence

#### A. Personal, Educational, and Vocational Evidence

Sims was born on January 22, 1968, and he was 49 years old on the date he applied for SSI. (Tr. 120). Sims graduated high school and attended college for "a little over two years." (Tr. 36, 141). He did not have any relevant past work experience. (Tr. 21).

#### B. Relevant Medical Evidence

The court has been unable to locate – and the parties have not cited – any medical records that exclusively or directly relate to Sims's obesity. *See generally* (Tr. 192-349).[2] Nevertheless, the record shows that Sims was diagnosed as morbidly obese as early as June 2007. (Tr. 198). At that time, Sims had high cholesterol, sleep apnea, and elevated blood pressure, but an examination showed that he had a regular heart rate and rhythm and no symptoms in his extremities. (Tr. 198, 201, 205).

On March 31, 2017, Sims saw neurologist Warren Selman, MD, for treatment of his vision loss. (Tr. 268). Dr. Selman noted that Sims weighed 410 pounds and had a BMI of 55.61, and he referred Sims for endocrine studies for a suspected pituitary adenoma. (Tr. 269-70).

---

[2] The majority of Sims's medical records deal only with his visual impairments, which are not relevant to his sole argument on judicial review. *See* (Tr. 192-349).

From April 4, 2017, through September 11, 2018, Sims saw endocrinologist Baha Arafah, MD,[3] for treatment of the suspected pituitary adenoma, which was later diagnosed as a prolactinoma with secondary conditions including adrenal insufficiency and hypothyroidism. (Tr. 249-52, 256-59, 262-65, 286-88, 302-04, 306-09, 311-14, 317-19, 336-38). On April 4, 2017, Sims told Dr. Arafah that he mostly stayed at home and was "not very physically active." (Tr. 286). He said that he otherwise "feels fine," although he had gained 20 pounds in the previous year and had muscle cramps "especially in the toes." (Tr. 286). On June 12, September 12, and November 14, 2017, and March 13 and September 11, 2018, Sims reported that he had improved energy, increased physical activity, the ability to walk half a mile four to five times a week, and improved muscle cramps. (Tr. 249, 256, 262, 302, 306, 311, 317, 336). On November 14, 2017, and March 13 and September 11, 2018, Sims denied having excessive fatigue at any certain points during the day. (Tr. 257, 263, 303, 307, 312, 336). On November 14, 2017, Sims said that the was able to climb 19 stairs 3 to 4 times per day. (Tr. 256, 311). On examinations throughout the treatment period, Dr. Arafah consistently found that Sims had a normal heart rate, normal respiration, no myalgias, no muscle cramps, no joint swelling, no joint stiffness, no limb pain, no limb swelling, and no edema in his extremities. (Tr. 250, 252, 257, 259, 263, 265, 288, 304, 307, 309, 312, 314, 338). Sims had also consistently lost weight over the treatment period, dropping from 430 pounds with a BMI of 58.32 in April 2017 to 376 pounds with a BMI of 51 in September 2018. (Tr. 250, 257, 259, 262, 265, 304, 307, 309, 312, 314, 319, 337-38).

---

[3] At various appointments with Dr. Arafah, Sims was also examined by endocrinology fellows Arman Rajapal, MD; Mehr Khan, MD; and Naur Sabha, MD. *See* (Tr. 249-52, 256-59, 262-65, 286-88, 302-04, 306-09, 311-14, 317-19, 336-38).

### C. Relevant Opinion Evidence

On May 12, 2017, state agency consultant Timothy Budnik, D.O., evaluated Sims's physical functional capacity based on a review of his medical records. (Tr. 54-57). Dr. Budnik determined that Sims had no exertional, postural, or manipulative limitations. (Tr. 54). Dr. Budnik stated that "despite [Sims's] physical conditions, [he was] still able to stand, lift, and walk enough to perform some types of work." (Tr. 57).

On November 6, 2017, state agency consultant Dimitri Teague, M.D., concurred that Sims did not have any exertional or manipulative limitations. (Tr. 67-68). But Dr. Teague found that Sims had the following postural limitations: (1) unlimited climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; and (2) never climbing ladders, ropes, or scaffolds. (Tr. 67-68). Dr. Teague further explained that "the medical evidence shows that [Sims's] ability to move is not significantly limited." (Tr. 72).

### D. Relevant Testimonial Evidence

Sims testified at the ALJ hearing. (Tr. 34-43). Sims said that he lived in the upstairs unit of a duplex, and he provided care for his mother who lived in the downstairs unit. (Tr. 34-35). He helped his mother with cooking, cleaning, mopping, going to the doctor, and other everyday chores. (Tr. 35, 38). He also took care of all "handyman" activities – fixing leaky faucets, burned-out outlets, cutting grass, and shoveling off the porch. (Tr. 38). He said he didn't do much shoveling or raking. (Tr. 38). Sims had a driver's license and drove every day to do errands, including grocery shopping and going to the doctor. (Tr. 36). Sims said that he was able to walk half a mile, but he had strained his Achilles and was no longer able to walk much. (Tr. 37, 40). He said that he could lift 10 to 15 pounds continuously. (Tr. 37).

4

Sims testified that he had not had a full-time job since 2003. (Tr. 36). He said that he was unable to work because he could only stand for short periods and he had limited eyesight. (Tr. 36). He said that he weighed 370 pounds, and his weight caused issues with his knees and ankles. (Tr. 35, 37). Sims said that he could sit for up to half an hour and stand for 20 or 30 minutes at a time. (Tr. 37). He said that his knees ached; and because his ankles would swell if he stood for longer than 30 minutes, he would have to elevate and ice his legs. (Tr. 41). He said he had to elevate his legs to knee height for one hour once a day, depending on what he'd done that day. (Tr. 42). He said that he had to rest throughout the day, and he was "good for 30 minutes or so" when doing tasks. (Tr. 39). Sims said that his thyroid medication had helped him lose weight, and he did not notice any adverse side effects from his medication. (Tr. 35, 39).

Brett Salkin, a vocational expert ("VE") also testified at the ALJ hearing. (Tr. 44-47). The ALJ asked the VE whether a hypothetical individual with Sims's age, experience, and education could work if he could "[n]ever climb ladders, ropes, or scaffolds. Never be exposed to unprotected heights, moving mechanical parts, or operate motor vehicles." (Tr. 44). The VE said that such an individual could work as a dishwasher, cleaner, or grocery bagger. (Tr. 44-45). If the hypothetical individual were additionally limited to "medium, frequent climbing of ramps and stairs, balance, stoop, kneel, crouch, crawl," he could perform the same work. (Tr. 45). If the individual from the first hypothetical were additionally limited to "light, occasional climbing of ramps and stairs, balance, stoop, kneel, crouch, crawl. Again, never be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle. Never climb ladders, ropes, or scaffolds," he could work as a cashier, sales attendant, or housekeeper. (Tr. 45-46). If any of the individuals from the first, second, and third hypotheticals were also "off

5

task 20 percent of an eight-hour work shift and/or absent from work two days per month," he could not perform any work. (Tr. 46).

## IV.   The ALJ's Decision

The ALJ made the following paraphrased findings relevant to Sims's argument on judicial review:

> 2.   Sims's severe impairments included obesity. (Tr. 17).
>
> 4.   Sims retained the residual functional capacity to perform light work, except he could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. The ALJ had considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. Sims's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the objective medical evidence and other evidence in the record. Sims's obesity was within the "extreme" obesity range under SSR 02-1p. His obesity could be expected to exacerbate his symptoms and create limitations in combination with his prolactinoma, hypothyroidism, and adrenal insufficiency. But the medical records were inconsistent with his testimony regarding his physical fatigue and other impairments related to his obesity. The medical records did not support a finding of exertional limitations beyond those assessed for his visual limitations. And those physical limitations, as well as Sims's alleged fatigue with exertion, were accounted for in the RFC. (Tr. 18-20).
>
> 9.   Considering Sims's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform. Such jobs included the representative occupations of cashier, sales attendant, and housekeeper. (Tr. 21-22).

Based on all of his findings, the ALJ determined that Sims had not been under a disability since May 27, 2016, the application date. (Tr. 22).

## V. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

7

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step sequential process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to

8

produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 416.912(a).

### B. Step Four: RFC, SSR 02-1p, and Subjective Complaints

Sims argues that the ALJ failed to adequately consider the walking, standing, and lifting limitations caused by his obesity in evaluating his RFC, as required by SSR 02-1p. ECF Doc. 13 at 7-8. Sims also asserts that the ALJ unreasonably concluded that his testimony regarding those limitations was inconsistent with other evidence and his daily activities. ECF Doc. 13 at 8-9. Further, Sims contends that the ALJ incorrectly determined that he had not raised concerns about standing and walking to his treating physicians when he had actually told Dr. Arafah that he "was not physically active and complained of muscle cramps especially in his toes." ECF Doc. 13 at 9. Sims argues that the ALJ's failure to adequately consider his obesity was not harmless because those limitations would have resulted in an RFC for sedentary work, for which the Medical-Vocational guidelines would have directed a "disabled" finding. ECF Doc. 13 at 9-10.

The Commissioner responds that the ALJ applied proper legal standards by considering all the evidence in the record including Sims's obesity, and that Sims did not satisfy his burden to show that his obesity affected his ability to do work. EF Doc. 15 at 5-9. The Commissioner argues that the ALJ adequately considered Sims's allegations that his obesity caused fatigue upon exertion and limited his ability to stand, but that medical records did not reflect the degree of limitation Sims alleged. ECF Doc. 15 at 8. Further, the Commissioner asserts that the ALJ accounted for Sims's obesity by limiting him to light work with additional physical limitations. ECF Doc. 15 at 8.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 416.920(e). The RFC is an

assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

As a medically determinable impairment, obesity can be reasonably expected to cause limitations – including impaired ability for sustained sitting, standing, walking, and lifting. SSR 02-1p, 2002 SSR LEXIS 1, at *16-17 (Sept. 12, 2002). When an ALJ finds that a claimant's obesity is a medically determinable impairment, he must consider whether the obesity causes any exertional, postural, manipulative limitations that would impact his ability to perform or sustain work activity. *Id.* The ALJ must also "explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." *Id.* at *18.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other

evidence."). If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The ALJ applied proper legal standards in evaluating Sims's RFC and the effects of his obesity. 42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241. The ALJ complied with the regulations by expressly considering all of Sims's severe and non-severe impairments in light of the medical and other evidence. (Tr. 18-21); 20 C.F.R. § 416.920(e); SSR 96-8p, 1996 SSR LEXIS 5. The ALJ dedicated an entire section of his decision to the analysis of whether Sims's obesity limited his ability to perform work, as required under SSR 02-1p, and whether his subjective complaints regarding his obesity-based limitations were consistent with the objective medical evidence as required under SSR 16-3p. (Tr. 19-20); SSR 02-1p, 2002 SSR LEXIS 1, at *16-18; SSR 16-3p, 2016 SSR LEXIS 4 *15. Further, the ALJ adequately explained that Sims's complaints regarding his obesity were *inconsistent* with the objective medical evidence, that the medical evidence did not support any obesity-related limitations beyond those caused by his vision loss, and that those limitations were accounted for in the RFC finding. (Tr. 19-20); SSR 02-1p, 2002 SSR LEXIS 1, at *18; *Blankenship*, 874 F.2d at 1123; *Felisky*, 35 F.3d at 1036.

Substantial evidence also supported the ALJ's decision to discount Sims's subjective complaints and conclusion that Sims's obesity did not cause limitations beyond those incorporated into the RFC. 42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241; *Biestek*, 139 S. Ct. at 1154. Such evidence included: (1) Sims's regular reports to Dr. Arafah that his ability to perform physical activity had improved, he was able to walk half a mile and climb 19 stairs, he had improved energy, and he did not have excessive fatigue at any point during the day; (2) regular examination findings that he had a normal heart rate, normal respiration, no myalgias, no muscle cramps, no joint swelling, no joint stiffness, no limb pain, no limb swelling, and no

11

edema in his extremities; (3) records reflecting consistent weight loss between April 2017 and September 2018; (4) Dr. Budnik's and Dr. Teague's opinions indicating that Sims did not have any exertional limitations and retained sufficient ability to stand, lift, and walk for work; and (5) Sims's own testimony that he was able to care for his mother who lived downstairs from him, was able to perform nearly all household chores and handyman activities for himself and his mother (albeit with rest periods built in), was able to drive, and could lift up to 15 pounds continuously. (Tr. 34-38, 54-57, 67-68, 249-52, 256-59, 262-65, 286-88, 302-04, 306-09, 311-14, 317-19, 336-38); *Blankenship*, 874 F.2d at 1123; *Felisky*, 35 F.3d at 1036.

Substantial evidence also supports the ALJ's finding that Sims "did not raise [standing or walking] concerns or complaints with his treating physicians when presenting for follow-up appointments." (Tr. 20); *Biestek*, 139 S. Ct. at 1154. Although Sims told Dr. Arafah that he was "not very physically active" and had toe cramps at his initial appointment in April 2017, Sims said he had improved physical activity and could walk half a mile at every follow-up appointment with Dr. Arafah. (Tr. 249-52, 256-59, 262-65, 286-88, 302-04, 306-09, 311-14, 317-19, 336-38). And because substantial evidence supported the ALJ's conclusions regarding the impact of Sims's obesity on his RFC, the decision to find no further limitations fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *Biestek*, 139 S. Ct. at 1154; *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15; *Jones*, 336 F.3d at 476; *Mullen*, 800 F.2d at 545.

Upon careful consideration of the record before the court, it is apparent that Sims has not demonstrated that the ALJ failed to apply proper legal standards or reach a conclusion supported by substantial evidence in evaluating the impact of Sims's obesity on his RFC.

## VI. Conclusion

Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Sims's application for SSI is AFFIRMED.

IT IS SO ORDERED.

Dated: October 30, 2020

Thomas M. Parker
United States Magistrate Judge